IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2014

## NICHOLAS SHORT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009B1035      Steve R. Dozier, Judge**

_____

**No. M2014-00614-CCA-R3-PC - Filed April 22, 2015**

_____

Petitioner, Nicholas Short, was indicted by the Davidson County Grand Jury for one count of first degree premeditated murder and one count of felony murder in the perpetration of an especially aggravated robbery. Petitioner was convicted by a jury of first degree premeditated murder in count 1 and the lesser-included offense of second degree murder in count 2. The trial court merged the two offenses and sentenced Petitioner to a term of life imprisonment. Petitioner appealed his conviction, and this court affirmed. *State v. Nicholas Short*, No. M2010-01914-CCA-R3-CD, 2012 WL 1593174 (Tenn. Crim. App., May 7, 2012), *perm. to app. denied* (Tenn., Sept. 20, 2012). Petitioner filed a petition seeking post-conviction relief on the basis that his trial counsel provided ineffective assistance of counsel. Following an evidentiary hearing, the post-conviction court denied post-conviction relief. Petitioner appeals the post-conviction court's denial of his post-conviction petition. Having carefully reviewed the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Leah R. Wilson, Nashville, Tennessee, for the appellant, Nicholas Short.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Rachel Sombrero, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

*Facts*

The facts adduced at Petitioner's trial were stated in this court's opinion in *State v. Nicholas Short*, No. M2010-01914-CCA-R3-CD, 2012 WL 1593174 (Tenn. Crim. App., May 7, 2012), *perm. to app. denied* (Tenn., Sept. 20, 2012). As pertinent to the issues in this appeal, the facts from trial, taken from that opinion, are as follows.

On December 9, 2008, Brandon Petty, a bail bondsman, who was driving in the area of the incident, heard gunshots. He saw two men struggling in a parking lot. He saw the victim on his knees, and a man whom he later identified as Petitioner, behind the victim. Petty testified that the victim looked like he was trying to get away. Petty testified that he saw Petitioner shoot the victim in the back. The victim was lying face down on the ground, and Petitioner was bent over him. Petty saw Petitioner pull down the victim's pants and go through his pockets. Petty got out of his vehicle, drew his weapon, and yelled at Petitioner to drop his gun. Petitioner casually walked away, then dropped his coat at the corner and ran away. Petty got back in his vehicle and drove in front of Petitioner. Petty's coworkers Tony Smith and David Fletcher chased Petitioner on foot. Petitioner stopped, but he did not comply with their commands. Smith shot Petitioner using a Taser gun, and the men apprehended Petitioner.

Smith's and Fletcher's testimony was consistent with Petty's testimony. Fletcher testified that he saw Petitioner "standing there with his arm extended out and fire coming from the front of his arm." He also observed Petitioner "maybe searching [the victim] or going through his pockets." Smith also saw Petitioner "standing over the [victim] firing rounds into the guy's back." He saw Petitioner bent over the victim, but he did not see Petitioner's hands in the victim's pockets. Both witnesses testified on cross-examination that they did not see what happened between Petitioner and the victim before they heard gunshots.

Investigators found a gun in the right sleeve of a jacket found around the corner of a building near the crime scene. The gun was empty and "in lock-back position," suggesting that it had been fired until empty of ammunition.

Detective Robert Hanson, of the Metro Nashville Police Department, interviewed Petitioner after his arrest. Detective Hanson testified that, based on his familiarity with Petitioner's voice, he recognized Petitioner's voice in phone calls placed from the jail. Portions of the phone calls and transcripts of the calls were admitted as evidence at trial. In

the first call, which occurred on December 12, 2008, Petitioner spoke with an unidentified male:

> [Petitioner]: Little buddy's people I hit . . . uh, Meathead gonna come holler at you about that you feel me?
>
> [. . . .]
>
> MALE: Yeah, but why'd you hit dude up like that man?
>
> [Petitioner]: Man, he f***ed with [Joe Joe] man.
>
> MALE: Joe Joe know what's going on?
>
> [Petitioner]: Don't . . . act like . . . man, I'm gonna handle it . . . cause [Joe Joe] playing me all the way to the left. He playing everybody to the left like he don't know what's going on. [Joe Joe] the one who set it up Daddy.
>
> MALE: Alright man.
>
> [Petitioner]: Don't say nothing to [Joe Joe] and them cause . . . . [. . . .]

*State v. Nicholas Short*, 2012 WL 1593174 at *3.

Doctor Sandra Thomas of the Davidson County Medical Examiner's Office testified that she reviewed the report and "body diagram" prepared by other doctors who performed an autopsy on the victim. Dr. Thomas testified that the victim suffered three gunshot wounds. One bullet entered the left side of the victim's back, over the shoulder blade area, traveled into the left lung cavity, through the lung, and exited the victim's chest in the area of the collar bone. Another bullet entered the victim's upper back "almost skim[ming] along the . . . back." It traveled into the right lung cavity, fractured a rib, went through the lower lobe of the right lung and the diaphragm, and then hit the liver, right adrenal gland, and the right kidney. The bullet was recovered from the victim's body. Another bullet entered the victim's lower back, traveled into the left lung cavity, through the lower left lung, and through the diaphragm. That bullet was also recovered from the victim's body. Dr. Thomas testified that this gunshot wound would be consistent with the victim's being shot while on his knees and the shooter standing behind him. Dr. Thomas testified that the second gunshot wound described above would be less consistent with this scenario due to the steep angle of travel, but it would be consistent with the shooter standing above the victim.

3

Doctor Thomas testified that the victim also had several abrasions on his forehead, the right side of the bridge of the nose, and the heel of the right hand. Dr. Thomas testified that the abrasions were consistent with the victim falling on asphalt. The victim also had abrasions on both knees, which were consistent with the victim crawling on his knees on asphalt. The cause of the victim's death was determined to be multiple gunshot wounds, and the manner of death was homicide.

Petitioner testified at trial that on the night of the offense, his friend Dejuan gave him a ride. Petitioner stated that he was armed with a "four-five" gun that night. Dejuan and Petitioner stopped at a clothing store. While Dejuan was inside the store, Petitioner stepped outside to smoke a cigarette. The victim, whom Petitioner did not know and had never seen before, walked toward Petitioner. The victim asked Petitioner about his chain and medallion and held the medallion in one hand. Petitioner drew his firearm and told the victim to "back up, homeboy." Petitioner testified that the victim "rushed" him. Petitioner tried to back up, but the victim grabbed him in a "bear hug." Petitioner, who had his right arm free, began "shooting wildly" over the victim's back.

Petitioner testified that he was trying to shoot the victim in the leg. Petitioner and the victim fell to the ground, and Petitioner continued shooting as they fell. Petitioner realized the victim was shot when the victim did not get up. Petitioner denied that he shot the victim while the victim was lying on the ground after Petitioner got up from the ground. Petitioner testified that he bent over to put on his shoe that had come off, and he saw the armed "bounty hunters" and ran.

Petitioner testified that he shot the victim because the victim rushed him after Petitioner told the victim to back away. He testified that he did not intend to kill the victim. He denied going through the victim's pockets. He testified that his mother had recently died and left him an inheritance, and he had no reason to rob the victim.

Petitioner testified that the victim did not have a gun, and Petitioner acknowledged that he lied in his statement to police in order to make the story more favorable to himself. Petitioner testified that the victim was "just asking me about a chain," and Petitioner did not know if the victim was going to harm him.

Petitioner testified about the jail phone call in which he said that he shot the victim because the victim had done something to "Joe Joe":

> I was asked why did I shoot him and I started to say one thing, but ended up just saying down there f***ing with [Joe Joe], like I was just down there

4

f***ing with [Joe Joe] and this all happened. Not because [the victim] messed with [Joe Joe] but me in general down there.

*State v. Nicholas Short*, 2012 WL 1593174 at *5.

*Post-conviction hearing*

Petitioner testified that he had "several complaints" against his trial counsel regarding trial counsel's alleged ineffective assistance. Petitioner testified that a juror worked with the victim's family. Petitioner told trial counsel that he "didn't feel comfortable with [that juror] being on the jury[,]" but trial counsel did not strike her from the jury. Petitioner testified that trial counsel failed to properly cross-examine the State's witnesses, Brandon Petty, Tony Smith, and David Fletcher. Petitioner testified that Brandon Petty made a prior inconsistent statement to the police, and trial counsel did not offer the prior statement as evidence. Petitioner testified that Mr. Petty, Mr. Smith, and Mr. Fletcher testified that they saw Petitioner go through the victim's pockets, but they later admitted that they could not see whether Petitioner's hands were in the victim's pockets. Petitioner testified that trial counsel "never did strike on that." Petitioner also testified that trial counsel should have objected to leading questions of those witnesses by the prosecutor.

Petitioner testified that he requested that trial counsel seek a "mental evaluation" for Petitioner because at the time of his trial, "it was a troubling time in [Petitioner's] life" because his mother had died four months prior to charges being brought against Petitioner. Petitioner also testified that trial counsel was ineffective for failing to object to Detective Hanson's testimony regarding jail phone calls on the basis that the detective was "not an expert in that field of voice recognition." Petitioner testified that trial counsel also should have objected to Dr. Thomas' testimony on the basis that she did not perform the victim's autopsy. Petitioner also felt that trial counsel should have recalled any eyewitnesses to testify after the gun expert testified to question the witnesses about the angle they saw Petitioner shoot the victim.

Petitioner testified that trial counsel did not discuss Petitioner's testimony with Petitioner or otherwise prepare Petitioner to testify at trial. Petitioner acknowledged, "what I gave a statement [to police] to and what I testified to was two different things." Petitioner testified, "like I said at trial, I can't see me looking at the family and just lying about the situation." Petitioner testified that trial counsel communicated a plea offer by the State of guilty to second degree murder in exchange for a 40-year sentence. Petitioner felt his "only option [was] to go to trial."

5

On cross-examination, Petitioner acknowledged that he had never been diagnosed with a mental disorder. He testified, "I was grieving at the time so my thoughts were not all in a straight arrow as they were supposed to be." Petitioner testified that he did not recall trial counsel cross-examining Detective Hanson about his expertise in voice recognition. Petitioner also acknowledged that he probably identified himself in the phone calls to the other parties to whom he was speaking. Petitioner did not recall trial counsel filing a motion seeking to prohibit Dr. Thomas from testifying.

Petitioner's trial counsel testified that he had been licensed to practice law in Tennessee since 1994. He estimated that 99 percent of his practice consisted of criminal defense. Trial counsel was appointed to represent Petitioner in 2009. Trial counsel testified that he visited Petitioner "many times in preparation for [Petitioner's] trial." Counsel reviewed discovery with Petitioner, and he discussed with Petitioner the charges against Petitioner and the potential sentences. Petitioner seemed to understand their discussions. Trial counsel testified, "I never got the impression from [Petitioner] that he was in any way mentally disabled or had any kind of psychological problems. Otherwise I would have had him evaluated." Petitioner did not inform trial counsel of any history of mental disorders. Trial counsel testified that he did not perceive any grounds to support a motion to suppress the jail phone call recordings. Regarding the State's plea offer, trial counsel testified:

> Well, I do recall telling [Petitioner] that he was going to get convicted in my estimation. I thought he had a very good chance, a very good chance of being convicted and that he should take the offer, because otherwise, he was going to be doing a life sentence and he rejected that.

Trial counsel testified that Petitioner consistently maintained pre-trial that he shot the victim in self-defense. Trial counsel advised Petitioner that the State's proof did not support Petitioner's theory of self-defense, and trial counsel explained that Petitioner would have to testify in order to provide proof in support of a jury instruction on self-defense. Trial counsel testified that Petitioner's "testimony at trial came as a complete shock" to him. Trial counsel testified, "it was just a complete about face" from what Petitioner had consistently told trial counsel, and Petitioner's "testimony came out of left field." Trial counsel testified that he reviewed his direct examination questions with Petitioner prior to Petitioner testifying at trial.

Regarding the testimony of the medical examiner, trial counsel testified, "I think I did file a motion about that, but it[']s sort of foggy in my mind to recall what that was about." Trial counsel cross-examined the medical examiner about the trajectory of the bullets in an effort to support Petitioner's theory of self-defense.

Trial counsel did not recall any instances of prosecutorial misconduct during the trial. He testified that he would have objected if there had been prosecutorial misconduct. Trial counsel testified that he did not remember an issue about a juror. He testified that if he had any indication that a juror was biased, he would have either asked the court to strike the juror for cause or he would have stricken the juror peremptorily. Trial counsel testified that he cross-examined Mr. Petty, Mr. Smith, and Mr. Fletcher, and he remembered that one of the witnesses was "a real questionable witness" and was involved in "this real shady business[,]" and one of the witnesses was "a very good witness" and "came off as a very credible witness."

*Analysis*

On appeal, Petitioner contends that his trial counsel was ineffective for: (1) failing to strike a juror that Petitioner informed him had a relationship with the family of the victim; (2) failing to cross-examine the State's witnesses about inconsistent statements the witnesses made during the investigation of the case; (3) failing to seek a mental evaluation for Petitioner; (4) failing to object to Detective Hanson's identification of Petitioner's voice in the jail phone call recordings; (5) failing to adequately prepare Petitioner to testify in his own behalf at trial; (6) failing to object to Dr. Thomas' testimony on the basis that she did not perform the autopsy that was the subject of her testimony; and (7) failing to object to testimony by a witness who was allegedly threatened by the prosecutor to revoke the witness's probation.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001). As a mixed question of law and fact, this court's review of a petitioner's ineffective assistance of counsel claim is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases[,]" *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense[,]" *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed.

7

2d 674 (1984). In other words, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id*. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In a written order denying post-conviction relief, the post-conviction court accredited the testimony of trial counsel. Regarding Petitioner's claim that trial counsel failed to object to a biased juror, the court found that "the alternate juror who had to replace a juror [who] was unable to report [on] the second day of trial due to an accident, was questioned as to her knowledge or familiarity with a witness from working with her years ago [and] [t]he juror indicated she could be fair." Regarding Petitioner's claim that trial counsel failed to properly cross-examine the eyewitnesses to the offense, the court found that "trial counsel properly questioned and examined the witnesses Petty, Smith, and Fletcher." The court noted that Petitioner did not present at the post-conviction hearing "any alternative questions that should have been asked of the witnesses." The court's order does not address Petitioner's allegation that trial counsel was ineffective for failing to seek a mental evaluation for Petitioner. Regarding Petitioner's allegation that trial counsel was ineffective for failing to object to Detective Hanson's voice identification, the court found that "the caller's voice was properly identified by the Detective who stated he was familiar with the Petitioner's voice." Regarding Petitioner's allegation that trial counsel failed to properly prepare Petitioner to testify, the post-conviction court "accredit[ed] the testimony of trial counsel that he had thoroughly and adequately prepared for trial, including discussions with the Petitioner about his version of events." The court further stated, "[t]rial counsel cannot be faulted for the Petitioner's change in testimony at trial that was a complete shock to him and their theory of defense." The post-conviction court did not make specific findings in its order regarding Petitioner's claim that counsel was ineffective for failing to object to Dr. Thomas' testimony on the basis that she did not perform the autopsy, or regarding Petitioner's claim that trial counsel was ineffective for failing to object to the testimony of a witness who was allegedly threatened by the prosecutor to revoke the witness's probation.

8

We conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to demonstrate that he was prejudiced by counsel's failure to strike a juror who allegedly had a relationship with a family member of the victim. The court implicitly accredited the testimony of trial counsel that he would have asked the court to strike the juror for cause or stricken the juror peremptorily if he had any indication that the juror was biased. We also conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel properly examined the State's witnesses and that Petitioner had not demonstrated that he was prejudiced by counsel's alleged deficient performance. Counsel testified at the post-conviction hearing that he would have examined the witnesses on any inconsistencies in their statements or testimony. Petitioner did not offer proof of any inconsistent statements or testimony by those witnesses at the post-conviction hearing. Petitioner also presented no proof at the post-conviction hearing that he suffered from any mental or psychological condition. Trial counsel testified at the hearing that Petitioner did not appear in any way to be mentally deficient, and that Petitioner did not inform him that he had any mental health history. Petitioner has failed to establish that counsel's performance was deficient or that he was prejudiced by these alleged deficiencies.

Petitioner claims that counsel was deficient for failing to object to Detective Hanson's testimony that he recognized Petitioner's voice in the jail phone calls because he was not an expert in voice identification. Petitioner asserts that he was prejudiced by the admission of the phone calls into evidence. Trial counsel testified that he did not know of a legal basis on which to seek suppression of the jail phone calls, and he cross-examined the detective about his qualifications. Tennessee Rule of Evidence 901(a) states, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Lay opinion testimony "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" can be used to authenticate or identify the speaker in a recording. Tenn. R. Evid. 901(b)(5). The post-conviction court found that the detective testified that he was familiar with Petitioner's voice and properly identified Petitioner's voice. The evidence does not preponderate against the post-conviction court's finding.

We also conclude that the evidence does not preponderate against the post-conviction court's finding that "trial counsel . . . thoroughly and adequately prepared for trial, including discussions with the Petitioner about his version of events." The court accredited the testimony of trial counsel and found that "[t]rial counsel cannot be faulted for the Petitioner's change in testimony at trial that was a complete shock to him and their theory of defense." Petitioner has failed to show that trial counsel's performance was deficient in this regard.

We also conclude that counsel's performance was not deficient for failing to object to the testimony of the doctor who had not performed the autopsy. Trial counsel testified that he filed a motion to exclude the testimony of Dr. Thomas on the basis that she did not perform the autopsy. This court has held that it was not error for a trial court to allow a pathologist who did not perform an autopsy to provide expert testimony based in part upon review of an autopsy report prepared by another pathologist. *State v. Thomas Lee Carey, Jr.*, No. M2013-02483-CCA-R3-CD, 2015 WL 1119454, *15 (Tenn. Crim. App., March 10, 2015) (Woodall, J., concurring). Petitioner presented no proof to show that the motion would have been granted if it were filed. Furthermore, trial counsel testified at the post-conviction hearing that he cross-examined Dr. Thomas about the trajectory of the bullets that entered the victim's body, and he believed the medical examiner's testimony supported Petitioner's theory of defense. Petitioner has failed to establish that trial counsel's performance was deficient or that he was prejudiced by his alleged deficiency.

Finally, regarding Petitioner's claim that trial counsel's performance was deficient for failing to object to the testimony of a witness who Petitioner alleges was threatened by the prosecutor to revoke the witness's probation, Petitioner presented no such evidence at the post-conviction hearing. Trial counsel testified that he was not aware of any prosecutorial misconduct, and that if he had been aware of misconduct, he would have objected and raised the issue on direct appeal. Petitioner has not demonstrated that counsel's performance was deficient.

For the reasons stated above, we affirm the post-conviction court's denial of post-conviction relief.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

10